NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0515n.06
Filed: August 20, 2008

No. 07-1357

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DAIMLER-CHRYSLER SERVICES NORTH AMERICA, LLC, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| SUMMIT NATIONAL, INC., | ) ) | |
| Defendant-Appellant. | ) ) | |

Before: SUHRHEINRICH, COLE, and GIBBONS, Circuit Judges

**JULIA SMITH GIBBONS, Circuit Judge.** This case involves a number of claims by Summit National Inc. ("SNI") against Daimler Chrysler Services North America, LLC ("DCS"). The claims relate to a "perpetual" license agreement, which allowed for DCS's use of SNI's Automated Leasing Account System ("ALAS") software. SNI argues that the district court erred by: (1) dismissing its claim for misappropriation of trade secrets; (2) dismissing its copyright infringement claim; (3) dismissing the remaining contract implied-in-law claim; (4) denying its motion *in limine* to strike expert testimony; and (5) denying its motion for attorneys' fees. We affirm the district court's judgment.

**I.**

1

Most of the relevant facts are not in dispute. SNI's predecessor, Stockholder Systems, Inc. ("SSI"), was the original owner of ALAS software. During the 1980's, SSI marketed ALAS through mass mailings, solicitations, and advertisements in trade journals. Ultimately ALAS customers included fifty-eight banks and financial institutions, two utilities, and ten other clients. SSI and its successors produced many versions of ALAS. The last recorded installation of ALAS occurred in April 1993.

In 1983, SSI entered into a Software Systems Agreement under which SSI granted DCS's predecessor, Mercedes-Benz Credit Corporation ("MBCC"), a "perpetual license" to use ALAS at its Portland, Oregon facility at a cost of $40,000. MBCC and DCS used ALAS to track leasing contracts, leasing customers, and vehicles subject to lease in the United States and Canada. Under the terms of the Software Agreement, ALAS could only be used at DCS's Portland facility to process data of DCS and its wholly owned subsidiaries. DCS could not use ALAS—characterized by the Software Agreement as a "trade secret"—at any other facility without notifying SSI and/or paying a license fee to SSI. The Software Agreement also included a non-disclosure provision requiring DCS to "take all reasonable steps to ensure" that ALAS would not be made available to any other person, firm, or corporation without SSI's written consent. SSI retained the right to terminate the Software Agreement if DCS breached and failed to take appropriate corrective action within thirty days of receiving notice of such a breach.

SNI acquired the rights to ALAS in July 1998. Contrary to the Software Agreement, DCS employees and others working on behalf of DCS used ALAS at locations other than the Portland facility. Specifically, SNI provided evidence that: during late 1998 and 1999, three outside companies hired to work on ALAS gained access to its source code and downloaded it to facilities

outside of Portland; in 2002 about 1400 DCS employees logged onto ALAS at non-Portland facilities; and in 2003, employees of an independent contractor hired to provide ALAS support and programming gained access to ALAS source code. DCS provided evidence suggesting that DCS and its contractors made significant changes to the ALAS system it used, causing it to no longer resemble the ALAS system licensed by SSI in 1983.

In May 2002, following notice to DCS and the thirty day cure period, SNI informed DCS that it was terminating the agreement and demanded that DCS cease using all licensed SNI products. DCS then initiated the present case by seeking a declaratory judgment that it was not in breach of the Software Agreement. SNI counterclaimed, seeking a declaratory judgment that DCS was in breach and injunctive relief prohibiting DCS from continued use of ALAS. On May 20, 2003, after the parties had filed cross-motions for summary judgment, the district court issued an order denying DCS's motion for summary judgment and granting in part SNI's motion for partial summary judgment. The district court concluded, *inter alia*, that DCS had breached the Software Agreement by disclosing ALAS to third parties and that a genuine issue of material fact existed as to whether SNI suffered any damages as a result of this breach. The district court issued a permanent injunction requiring DCS to halt its use of ALAS software within 180 days.[1]

In June of 2003, SNI amended its counterclaim to add counts of misappropriation of trade secrets and copyright infringement. In response, DCS filed a second motion for summary judgment, arguing that, *inter alia*, because SNI did not possess the 1983 ALAS source code, it could not establish copyright infringement, breach of contract, or trade secret misappropriation. In an April

---

[1] This court affirmed the injunction issued by the district court. *See Daimler Chrysler Servs. N. Am. v. Summit Nat'l, Inc.*, 144 F. App'x. 542 (6th Cir. 2005).

8, 2004 order, the district court determined that genuine issues of material fact remained regarding these issues and denied DCS's motion.

Following the April 2004 order, new evidence—now undisputed by the parties—came to light. First, it became clear that the 1983 version of ALAS source code ("ALAS 6.0") did not contain copyright notice. Second, SNI acknowledged that it did not possess its own copy of the ALAS 6.0 source code. In addition, SNI withdrew its claim for pre-termination breach of contract damages relating to DCS's disclosure of ALAS source code to third parties. Given these developments, the district court revisited SNI's copyright, trade secret, and breach of contract claims.

In an April 2006 order, the district court: (1) dismissed SNI's copyright infringement claim, concluding that ALAS 6.0 was publicly distributed in 1983 without the notice then required under the Copyright Act; (2) dismissed SNI's trade secret claim, concluding that actual knowledge of the secret information was required, but absent; and (3) explained that SNI could still pursue "[e]quitable relief under a quantum meruit theory based on DCS's continued use of ALAS after SNI terminated the Software Agreement."[2] Therefore, only the "*quantum meruit*" claim—as articulated by the district court—survived this order.

In an August 3, 2006 order, the district court explained that *quantum meruit* "measures recovery under a quasi-contract or contract implied in law." It further explained that whereas "[i]n a typical quantum meruit case, the value of an object or service to a defendant will be roughly equal to its value to a plaintiff," in this case, "ALAS was worth much more to DCS" than to SNI. But the

_____

[2] The district court also noted that SNI could still pursue legal or equitable relief based upon DCS's use of ALAS at remote locations. But SNI subsequently withdrew its claim for damages based on this alleged breach.

4

district court rejected SNI's argument that its damages should be based on an "'unjust enrichment' approach," that would quantify the value of DCS's post-termination use based upon the value of ALAS to DCS. Specifically, the district court explained that:

> [T]he appropriate measure of SNI's quantum meruit recovery here is based on the value of ALAS to SNI. In other words . . . how much money would a willing buyer have paid SNI for use of the ALAS source code at issue for eighteen months? . . . Whatever the number is, it must not be based on the value of ALAS to DCS at the time of termination. Because DCS had so substantially integrated ALAS into its leasing system, its replacement costs provide a poor indicator of the market value of ALAS. In sum, to recover quantum meruit damages on a theory of contract implied in law, SNI must come forward with evidence of what it reasonably could have charged a willing buyer, in an open market, for eighteen months of the use of source code at issue.

The eighteen months roughly constitute the period between when SNI terminated the Software Agreement (May 2002) and when DCS actually ceased using ALAS (on or around November 20, 2003). Following the August 2006 order, the district court ordered SNI to answer the following interrogatories: (1) "[What is] the amount it could have charged a willing buyer in an open market for eighteen months of use of the source code at issue ('the Quantum Meruit Damages')?"; and (2) "[Please identify] any damages not identified in response to Interrogatory No.1" including "the exact amount of those damages, the legal theories upon which those damages are based, the facts supporting the elements of such legal theory, [and] the methodology and calculations used in arriving at the claimed amount of damages."

SNI responded that "the amount is $3.225 million." It further explained that this number was premised upon, *inter alia*, the volume of DCS's leasing business, the number and locations of DCS users of ALAS, DCS's lease revenue, and the amounts DCS paid for subsequent software licenses.

In its February 13, 2007 order, the district court determined that SNI's answer was deficient because its damages calculation was based upon the value of ALAS to DCS (or what it might have cost DCS to replace ALAS). It further concluded that "SNI's failure to respond within the boundaries outlined in its prior opinions and proceedings is indicative of the fact that SNI is unable to produce admissible evidence that the value of ALAS 6.0 in the marketplace is anything other than zero." This conclusion was consistent with the July 2002 deposition testimony of Kenneth Duffy, president of SNI. At that time, Duffy stated that: "There is no market for ALAS. . . . I wouldn't in good conscience sell it to anybody." He also noted that SNI had made no efforts to sell ALAS since acquiring it in 1998. Finding that DCS's use of the ALAS source code did not cause SNI any *quantum meruit* damages, the district court dismissed the contract implied-in-law claim as a matter of law.

## II.

This court reviews the grant of a motion for summary judgment *de novo. F.R.C. Intern., Inc. v. United States,* 278 F.3d 641, 642 (6th Cir. 2002). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not appropriate if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In reviewing a grant of summary judgment, we draw all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III.

SNI argues that the district court erred by dismissing its misappropriation of trade secrets claim. SNI argues that (1) the "law of the case" doctrine foreclosed "relitigation" of whether ALAS constituted a trade secret, and (2) even if the issue could be litigated, the district court erred in concluding that ALAS was not a trade secret under Michigan law. Both arguments lack merit.

## A.

SNI first argues that "law of the case" doctrine precluded the district court from determining that ALAS source code did not constitute a trade secret because this court had already "decided" this issue by affirming the district court's May 2003 order. "Under the doctrine of the law of the case, determinations of the court of appeals of issues of law are binding on both the district court on remand and the court of appeals upon subsequent appeal." *United States v. Campbell,* 168 F.3d 263, 265 (6th Cir. 1999) (citation omitted). But "the trial court is free to consider any issues not decided expressly or impliedly by the appellate court." *Kavorkian v. CSX Transp., Inc.*, 117 F.3d 953, 958-59 (6th Cir. 1997) (internal quotation marks and citation omitted).

This court's August 2005 opinion did not decide whether ALAS source code constituted a trade secret for the purposes of SNI's tort claim. Instead, this court affirmed the district court's May 2003 order granting partial summary judgment to SNI on its claim that DCS breached the Software Agreement by disclosing ALAS to third parties. The May 2003 order did not address whether ALAS source code constituted a "trade secret." In fact, SNI did not assert a trade secret claim until it amended its counterclaim on June 20, 2003. And this court's August 2005 opinion expressly

7

provided that the April 2004 Order—in which the district court first addressed SNI's trade secret claim—"is not before us now."

**B.**

Alternatively, SNI argues that the district court erred because ALAS source code was SNI's trade secret. In this diversity action, we apply the choice of law provisions of the forum state. *See Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008). In tort actions such as this, Michigan choice of law principles provide that Michigan law applies absent a rational reason—such as another state's interest—to apply other law. *See Sutherland v. Kennington Truck Service, Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997). Because neither party offers a rational reason to apply any other law, Michigan law applies to SNI's trade secret (tort) claim. Under the Michigan Uniform Trade Secrets Act ("MUTSA"):

> "Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d). Courts applying Michigan Law have further explained that a "trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614 (Mich. 1981) (quoting Restatement of Torts § 757, cmt. b); *accord Raymond James & Associates, Inc. v. Leonard & Co.* 411 F. Supp. 2d 689, 696 n.3 (E.D. Mich. 2006).

8

Of critical importance here, to be worthy of trade secret status, the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors. *See Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398, 410-11 (6th Cir. 2006) (applying Michigan law); *see also US West Communications, Inc. v. Office of Consumer Advocate*, 498 N.W. 2d 711, 714 (Iowa 1993) (defining "independent economic value" as "information kept secret that would be useful to a competitor").

The district court concluded that because SNI could not produce a copy of ALAS source code, ALAS could not have provided SNI a competitive advantage over its competitors. The district court reasoned "that a person must actually know the secret information or possess the secret device in order to have an advantage over others."

We conclude that SNI has not provided sufficient evidence to suggest that ALAS derived any independent economic value from its secrecy when it was allegedly misappropriated. We need not resolve whether to show that ALAS was a trade secret in 1998—the first alleged instance of ALAS misappropriation—SNI was required to produce a copy of ALAS source code during discovery in 2003. The fact that SNI did not retain a copy of ALAS may suggest that the information was not particularly valuable to SNI in 1998. But other evidence also supports this conclusion. ALAS was not marketed or sold after 1993. Moreover SNI's president acknowledged that by 2002, ALAS had no market value. While ALAS could theoretically have still had some value to SNI or its competitors in late 1998 despite these facts, SNI has offered no evidence to suggest this. Instead, it has only offered evidence regarding the value of ALAS to DCS due to DCS's continued dependence on the antiquated software. This evidence alone does not create a genuine issue of material fact as to whether ALAS afforded SNI a competitive advantage based on its value to SNI

9

and potential competitors, *see Mike's Train House*, 472 F.3d at 410-11, at the time of its alleged misappropriation.   Therefore, the district court did not err in dismissing this claim as a matter of law.

**III.**

SNI next argues that the district court erred by dismissing its copyright infringement claim. SNI claims that DCS infringed its copyright for ALAS 6.0.  The 6.0 version of ALAS was licensed to DCS in 1983.  Under the Copyright Act in effect at that time, 17 U.S.C. 405(a) (1982),[3] notice was required for a "publically distributed" work to be protected by the Act.  This notice requirement still applies to works publicly distributed prior to the Berne Convention Implementation Act of 1988. *See Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 48 (5th Cir. 1995).  SNI acknowledges that it sold ALAS 6.0 without notice, but argues that notice was not required because it did not "publically distribute" ALAS 6.0.   Although the Copyright Act does not define "publically distributed," courts have looked to the Act's definition of "publication" to determine whether a work was "publicly distributed."  *See Intown Enterprises, Inc. v. Barnes,* 721 F.Supp. 1263, 1265 (N.D. Ga. 1989); *Schuchart & Assocs. v. Solo Serve Corp*., 1983 WL 1147, at*13 (W.D.Tex. June 28, 1983).  "'Publication' is the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  The offering to distribute copies . . . to a group of

---

[3] This provision provided:

Whenever a work protected under this title is published in the United States or elsewhere by authority of the copyright owner, a notice of copyright as provided by this section *shall* be placed on all publicly distributed copies from which the work can be visually perceived . . .

17 U.S.C. § 401(a) (1982) (emphasis added).

persons for purposes of further distribution, public performance, or public display, constitutes publication. . . ." 17 U.S.C. § 101.

"Limited publication," an exception to this definition, allows plaintiffs to proceed with infringement actions without fulfilling the notice requirement. *See Intown Enterprises,* 721 F. Supp. at 1265; *Williams v. Arndt,* 626 F. Supp. 571, 578 (D. Mass. 1985). Limited publication occurs where a work is distributed (1) to a definitely selected group of people; *and* (2) for a limited purpose, without the right of further reproduction, distribution or sale. *D.C.I. Computer Sys. Inc. v. Pardini*, 1992 WL 323325, at *1 (9th Cir. Nov. 5, 1992) (citing *White v. Kimmell,* 193 F.2d 744, 746-47 (9th Cir. 1952)); *Brown v. Tabb*, 714 F.2d 1088, 1091 (11th Cir. 1983). Both prongs of this test must be met for notice to be excused. *Brown*, 714 F.2d at 1091.

The first requirement is satisfied where a plaintiff only distributes a work to "a definite, very selective group." *Williams,* 626 F. Supp. at 573, 578 (commodities trading booklet distributed to eleven preferred customers who requested it); *see also Intown Enters*, 721 F. Supp. at 1265-66 (building plans distributed to a limited group of subcontractors for bidding purposes). This prong is not satisfied where a plaintiff distributes a work to the general public, *Data Cash Sys., Inc. v. JS & A Group, Inc.*, 628 F.2d 1038, 1041-43 (7th Cir. 1980), or even to a targeted market sector, *see D.C.I. Computer*, 1992 WL 323325, at *1 (program licensed "to any . . . vehicle dealership in the country that would agree to enter a contract"); *M & A Assocs, Inc. v. VCX, Inc.*, 657 F. Supp. 454, 462 (E.D. Mich. 1987) (movie distributed to a number of adult cinemas for public viewing), *aff'd* 856 F.2d 195 (6th Cir. Aug. 15, 1988) (unpublished table decision).

ALAS does not meet this requirement. ALAS was aggressively marketed through mass mailings, solicitations, and advertisements in trade journals. While its marketing may have been

11

somewhat targeted, ultimately ALAS customers included a variety of banks, financial institutions, utilities, and other corporations willing to pay for it. Because ALAS was not provided to a definite, very selective group, the district court properly dismissed SNI's copyright claim.

## IV.

We next address SNI's contract implied-in-law claim. The district court, *sua sponte* suggested that SNI could pursue recovery for DCS's post-termination use of ALAS based upon a "*quantum meruit*" theory. It eventually dismissed any such contract implied-in-law claim after concluding that SNI had failed to establish that ALAS had any market value. On appeal, SNI essentially argues that as part of its contract implied-in-law analysis, the district court should have considered damages under an unjust enrichment theory—focusing on DCS's enrichment as a result of using ALAS following the termination of the Software Agreement. We conclude, however, that SNI has not established the unjust enrichment or inequity required to prevail under Michigan law on a contract implied-in-law theory.

## A.

In determining the applicable substantive law in contract actions, the Michigan Supreme Court has provided some indication that we should look to the approach found in the Restatement (Second) of Conflict of Laws. *See Chrysler Corp. v. Skyline Indus. Services, Inc.*, 528 N.W.2d 698, 703-04 (Mich. 1995); *see also Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 705 (6th Cir. 2002). Under this approach, choice of law provisions are given effect "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1). The Software Agreement in this case provides that it is to be "governed by the laws of . . . Georgia." Because the implied-in-law contract

12

claim at issue in this case does not arise from the Software Agreement itself, however, the district court concluded that Michigan law applies to this claim. Because neither party disputes this conclusion on appeal, we will assume that Michigan law applies to this claim.[4]

**B.**

As an initial matter, DCS argues that a contract implied-in-law could not exist covering DCS's post-termination use of ALAS because an express contract (the Software Agreement) already existed. "An implied contract cannot be enforced where the parties have made an express contract covering the same subject matter." *Scholz v. Montgomery Ward & Co.*, 468 N.W.2d 845, 849 (Mich. 1991). But in this case, once the Software Agreement was terminated, it did not cover the "same subject matter" as the implied-in-law contract, which covered DCS's continued, *post-termination use* of ALAS. Thus the district court did not err by allowing SNI to pursue an implied-in-law contract remedy.

**C.**

SNI argues that the district court erred in analyzing the contract implied-in-law claim by not considering any potential unjust enrichment to DCS. It is not surprising that SNI would make this argument. Because DCS relied upon ALAS, the value of ALAS to DCS was significant; but the value of ALAS to SNI—and to the world market—was likely zero.[5] Again, SNI never pled damages based on any contract implied-in-law theory. Instead, the district court noted that SNI could pursue

---

[4] In any event, we see no conflict of law issue here as the application of Georgia law would not lead to a different result. *See infra* note 6.

[5] Again, Kenneth Duffy, president of SNI, stated in deposition that: "There is no market for ALAS. . . . I wouldn't in good conscience sell it to anybody."

13

"*quantum meruit*" damages for DCS's post-termination use of ALAS based upon an implied-in-law contract theory. The district court then concluded that these damages should be based on the value of ALAS to SNI, not to DCS. Under Michigan law, contracts implied-in-law have given rise to claims termed "*quantum meruit*" and "unjust enrichment." Therefore the district court's focus on the phrase "*quantum meruit*" was somewhat confusing. Regardless, we conclude that SNI has not shown the element of unjust enrichment or inequity that is required to establish a contract implied-in-law claim.

A contract implied-in-law is "imposed by fiction of law, to enable justice to be accomplished, even in case no contract was intended." *Cascaden v. Magryta,* 225 N.W. 511, 512 (Mich. 1929). "A contract may be implied in law where [1] there is a receipt of a benefit by a defendant from a plaintiff and [2] retention of the benefit is inequitable, absent reasonable compensation." *Matter of Estate of Lewis*, 423 N.W.2d 600, 603 (Mich. Ct. App.1988) (citation and quotation marks omitted). Thus, under Michigan law, part of the rationale for implying a contract-in-law—whether it is called unjust enrichment or *quantum meruit*—is to prevent unjust enrichment. *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991) (explaining that the elements of a "contract-in-law . . . to prevent unjust enrichment . . . are: (1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain") (citation and quotation marks omitted); *Roznowski v. Bozyk,* 251 N.W.2d 606, 608 (Mich. Ct. App. 1977) (explaining that in granting *quantum meruit* relief, "the court conclusively implies an intent to pay for services, in order to prevent unjust enrichment"). Once a contract is implied-in-law, courts applying Michigan law—unlike courts in other jurisdictions —have used both the phrase "quantum meruit" and "unjust enrichment" to describe the theory of recovery. *See, e.g.*, *In re Estate of McKim v. Cornell,* 606

14

N.W.2d 30, 33 (Mich. Ct. App.1999) ("*quantum meruit*"); *Kammer Asphalt Paving Co. v. East China Township Sch.,* 504 N.W.2d 635, 640 (Mich.1993) ("unjust enrichment"); *Morris Pumps v. Centerline Piping, Inc.,* 729 N.W.2d 898, 907 (Mich Ct. App. 2006) (using the phrases interchangeably).

Regardless of what SNI's contract implied-in-law claim is called, it requires a showing that DCS was unjustly enriched.[6] "Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is *unjust* for him to retain it." *Dumas*, 473 N.W.2d at 663 (emphasis added) (quoting Restatement of Restitution, § 1, cmt. c.); *see also Hollowell v. Career Decisions, Inc.,* 298 N.W.2d 915, 920-21 (Mich. Ct. App. 1980) (concluding that summary judgment was appropriate where the plaintiff failed to offer any proof indicating that the value of the services she performed exceeded the compensation she received). The Michigan Supreme Court has emphasized that implying a contract-in-law to prevent unjust enrichment "should be approached with some caution." *See Dumas*, 473 N.W.2d at 663 (citation and quotation marks omitted).

In this case, although DCS retained a benefit by using ALAS following termination of the Software Agreement, SNI has failed to persuade us that allowing DCS to retain this benefit is *unjust*. The Software Agreement originally allowed DCS to use ALAS indefinitely. When DCS breached the agreement by disclosing ALAS to third parties, SNI was entitled to seek an injunction and any

---

[6] Under Georgia law, an unjust enrichment claim is also based on a contract implied-in-law theory. *Engram v. Engram*, 463 S.E.2d 12, 15 (Ga. 1995) ("[U]njust enrichment applies when as a matter of fact there is no legal contract . . ., but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return or compensate for.") (citation and quotation marks omitted). A plaintiff has the burden of showing that a benefit conferred to a defendant was unjust. *Id*.

15

actual damages resulting from the breach.[7]  Clearly DCS was benefitted by using ALAS during litigation and for an additional 180 days, pursuant to the district court's decision to allow this limited post-termination use.  But SNI has not shown how DCS's continued use of an obsolete product with no value in the extrinsic market was unjust. Even when the district court explicitly provided SNI—through special interrogatories—an additional opportunity to advance other theories of recovery, SNI failed to offer any evidence of injustice associated with DCS's use of ALAS for eighteen months following termination of the Software Agreement.  Because we are to approach the business of implying contracts-in-law with caution and because SNI has failed to convince us that injustice occurred in this case, we conclude that the district court did not err in dismissing the remaining contract implied-in-law claim.[8]

As a result, we need not address SNI's contention that the district court erred in denying its motion *in limine* to strike expert testimony related to the issue of contract implied-in-law damages.

## V.

Finally, SNI argues that the district court erred by denying its motion for attorney's fees without prejudice.  Pursuant to the Software Agreement, which provides that the "prevailing party" may claim attorney's fees, SNI filed a motion requesting attorney's fees after the district court enjoined DCS from using ALAS after 180 days.  The district court denied SNI's motion without prejudice.  SNI did not filed any subsequent motions requesting attorney's fees.

---

[7] Again, SNI withdrew its claim for damages associated with DCS's breach through third-party disclosure.

[8] Because we conclude that SNI failed to establish the element of injustice required to establish a contract implied-in-law, we need not determine whether the district court properly analyzed damages under a *quantum meruit* theory.

16

As an appellate court, we only have jurisdiction to entertain appeals from final orders. 28 U.S.C. § 1291. Attorney fee issues are subject to these "ordinary principles of finality," and if not ruled on by the district court, are not reviewable by this court. *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1219-20 (6th Cir.1987). "[A] dismissal without prejudice is not a 'final order' within the meaning of 28 U.S.C. § 1291." *United States v. Moss*, 217 F.3d 426, 430, n.1 (6th Cir. 2000). Because the district court did not issue a final order on the issue of attorney's fees and did not make findings of fact regarding the amount of any such attorney's fees, we conclude that this claim is not properly before this court.

## VI.

For the foregoing reasons, we affirm the district court's dismissal of SNI's trade secret, copyright, and contract implied-in-law claims.