Daniel J. O'NEILL, Plaintiff–Appellant,

v.

DELL PUBLISHING CO., INC., Neal R. Burger, and George E. Simpson, Defendants–Appellees.*

No. 80–1147.

United States Court of Appeals, First Circuit.

Argued Sept. 5, 1980.

Decided Nov. 18, 1980.

J. Joseph Nugent, Jr., Providence, R. I., with whom Nugent & Nugent, and W. Albert Martin, Providence, R. I., were on brief, for appellant.

Patricia S. Nelson, Boston, Mass., with whom John R. Hally, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for appellees.

---

* *Editor's Note:* The opinion of the United States Court of Appeals, Ninth Circuit in *Cheung v. District Director, Immigration and Naturaliza-* *tion Service*, published in the advance sheets at this citation (630 F.2d 685), was withdrawn from bound volume at the request of the Court.

Before CAMPBELL and BOWNES, Circuit Judges, KEETON,* District Judge.

BOWNES, Circuit Judge.

In this copyright case, plaintiff–appellant, Daniel J. O'Neill, appeals from summary judgment in favor of defendant–appellee, Dell Publishing Co., Inc., and the dismissal for lack of jurisdiction as to defendants–appellees, Neal R. Burger and George E. Simpson. Plaintiff claims that the defendants violated his common law copyright in his unpublished manuscript novel, Return to Nowhere, by publication of the book, *Ghost Boat*, written by Burger and Simpson and published by Dell. We affirm the grant of summary judgment on the basis of lack of substantial similarity and find it unnecessary to reach the jurisdictional issue.

The legal principles applicable to determining whether summary judgment is appropriate were enumerated and explicated by us in *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976). In determining whether the requirements of Fed.R. Civ.P. 56(c) [1] have been met, the court must look at the record in the light most favorable to the opposing party and indulge all inferences favorable to that party. To defeat the motion, the opposing party must show that there is a genuine and material issue of fact. The evidence as to the dispute must be substantial and go beyond the allegations of the complaint. *Id.*

■ In order to determine the summary judgment issue, we must first outline the basic principles of copyright law. To establish a prima facie case of wrongful appropriation of expression by common law copyright infringement,[2] the plaintiff must prove substantial similarity and access.

*Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979). "Ordinarily, wrongful appropriation is shown by proving a 'substantial similarity' of *copyrightable* expression." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) (emphasis in original). The basic issue in a copyright action is whether there has been a wrongful appropriation of expression. Copyright protection extends only to the expression of the idea; it does not protect the idea itself. "It must be remembered that copyright protection does not extend to ideas, plots, dramatic situations and events. Rather, it is limited to the arrangement of words the author uses to express his ideas." *Scott v. WKJG, Inc.*, 376 F.2d 467, 469 (7th Cir.), cert. denied, 389 U.S. 832, 88 S.Ct. 101, 19 L.Ed.2d 91 (1967). See *Franklin Mint Corp. v. National Wildlife Art Exchange*, 575 F.2d 62, 64 (3d Cir.), cert. denied, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978); *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.), cert. denied, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *Morrissey v. The Proctor & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

In deciding the motion for summary judgment, the district court concentrated on the issue of substantial similarity of expression. The court read the manuscript, Return To Nowhere, and the claimed infringing book, *Ghost Boat*. It found no similarity of copyrightable expression between the two works: "Assuming access and copying, the only part of Return To Nowhere that is incorporated in *Ghost Boat* is the idea or concept of a lost World War II

---

* Of the District of Massachusetts, sitting by designation.

1. The pertinent provisions of Fed.R.Civ.P. 56(c) are:

   The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, to-

gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

2. Defendants do not dispute that plaintiff's manuscript is entitled to common law copyright protection.

submarine that mysteriously surfaces thirty years later."

■ Substantial similarity is measured by the standard of the "ordinary reasonable person." *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d at 1164. The standard has also been phrased as that of the "ordinary observer." *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 (2d Cir. 1977). The issue, therefore, is whether the district court was correct as a matter of law that the ordinary reasonable person would not find any substantial similarity between the two works. Even though the ultimate issue of "substantial similarity," in contrast with issues about subsidiary facts, is a mixed question of fact and law, any factual element of that issue must be decided in the trial court and reviewed on appeal as issues of fact are decided and reviewed. *See Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 109 n.2 (1st Cir. 1979). Whether or not a jury has been demanded, it is, of course, inappropriate for a court to weigh evidence and make a finding on a disputed question of fact when ruling upon (or when reviewing a ruling upon) a motion for summary judgment. Thus, the relevant question before the trial court on defendant Dell's motion for summary judgment, and before us on appeal, is whether the only finding that could be reached by a fact finder, correctly applying the applicable legal standard, is that there is no "substantial similarity" between the two works.

■ In comparing two literary works to determine if there is substantial similarity, it must be borne in mind that "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's Television Workshop*, 533 F.2d at 91. Our comparison of the two novels is made in the light most favorable to the plaintiff and indulging all inferences in his favor. *Hahn v. Sargent*, 523 F.2d at 464.

As the district court noted, Return To Nowhere uses the Rip Van Winkle theme of a sleep that lasts for years. Instead of taking place in the Catskill Mountains and being induced by strong drink quaffed during a game of "bowls" with little men, the sleep in Return To Nowhere takes place off the coast of Alaska when a submarine with its entire crew is trapped under a massive ice formation. Unlike old Rip, however, the submariners do not age as the years pass. When awakened from their frozen state, they are the same age as when the submarine dove under the ice pack on Christmas Eve, 1942, to avoid Japanese destroyers. The return of the submarine and the awakening of its crew is the result of underground nuclear tests held in Amchitka in the Aleutian Islands in May of 1974. The test causes a severe earthquake which frees the submarine from its ice tomb. As it drifts southerly, the crew awakens, unaware that thirty–two years have passed. They promptly torpedo the first Japanese ship they sight. This results in the submarine and crew being "captured" by the United States Navy and brought to the Navel base at San Diego.

The novel is divided into two parts. The first part is devoted mainly to character portrayals of different members of the crew. The second part is a study of the crew's struggle to adjust to life in 1974. The author focuses on four of the crew members: James Michael Shannon, the commander of the submarine; the Chief Petty Officer, Jack Brindle; and two enlisted men, John Stykowski and Bill Frazer.

Shannon is an Annapolis graduate, a devoted husband and father and a devout Catholic. Chief Brindle is a stereotypical Navy C.P.O., a thoroughly competent noncommissioned officer with a penchant for brawling and drinking when not on duty. He has an unfaithful wife considerably younger than himself; he is delighted when he realizes that, now, the tables will be turned. Stykowski is a big man of great strength. His main attributes are his devotion to the Navy and his friends and his unquestioning acceptance of the moral code of America during World War II. Frazer is a sensitive intellectual type who comes

from a home dominated by a nagging mother who makes no bones about her preference for his older brother, a ne'er–do–well with an eye for the quick buck. Frazer is in love, or at least thinks he is in love, with a young lady, but the romance makes little progress.

The reaction of the main characters to life in the United States in 1974 is predictable. Chief Brindle gets drunk; coming upon a gala opening of a Toyota distributorship in New York City, he smashes the showroom window. Stykowski learns that his brother has been killed in a robbery. The police have no information as to the killer. While wandering around aimlessly he stops at a restaurant which is invaded by a motorcycle gang attired in neo–Nazi trappings. When the gang starts to beat up a helpless policeman, Stykowski jumps into the fray. He kills one of the gang and renders the rest *hors de combat*. The police are, of course, delighted with his display of citizen courage and fighting ability. It is hinted that the dead cyclist, who was a Vietnam veteran, was the one who robbed and killed Stykowski's brother.

Frazer returns to New London, Connecticut, his home as well as the home berth of the submarine. He thinks he recognizes his former girlfriend who is now in her late 50's or early 60's. Overwhelmed by the changes in her and his home town, he becomes depressed and commits suicide by jumping into the river. As an ironic touch, the commander of a nuclear submarine moving up the river is asked to keep a lookout for his body.

On his return to Hyannis, Shannon finds both his and his son's names on a monument to those who were killed in World War II and the Korean War. Confronted with the death of his namesake, a Marine corporal who died in the Korean conflict, and overcome with the changes time has wrought, Shannon turns to a priest for help. After much soul searching, he seeks out his wife, who has not remarried. Despite the great difference in their ages, she is now 60, they resolve to spend their remaining years together.

The three main characters return to San Diego to participate, along with the rest of the crew, in a carefully planned psychological program designed to bring the men from 1942 into 1974 with as little time shock as possible. Unfortunately the author left out what could have been the most interesting aspect of the book, a detailed explanation of the time bridging program.

*Ghost Boat* bears little resemblance to Return to Nowhere. The time gap, unlike that in plaintiff's work, is not the vehicle for a portrayal of time shock, but is the device for a voyage into the supernatural. In *Ghost Boat* the core of the plot is not the contrast between two eras, but a time warp located somewhere in the Pacific at Latitude 30° N. Return to Nowhere used the Rip Van Winkle theme. *Ghost Boat's* main theme is a Pacific Bermuda Triangle time warp that envelops the submarine USS Candlefish on December 11, 1974. One of the main characters in *Ghost Boat* is the submarine itself; it parts and operation are described in great detail. The submarine in Return To Nowhere, which is of a different class, receives little attention. Its only role, like that of the massive ice floe, is to get the crew from 1942 to 1974.

The Candlefish, after going through a series of gyrations resembling epileptic seizures, disappears at Latitude 30° N. on the night of December 11, 1942. One member of the crew, Lieutenant James Hardy, is on deck at the time of her final dive. He is swept overboard, rescued by Japanese fishermen, and spends the duration of the war working in Japanese copper mines as a prisoner of war. On October 5, 1974, the Candlefish resurfaces directly in front of a Japanese freighter. The Navy is notified. The sub appears to be in excellent condition, yet the boarding party is unable to open her hatches and there is no sign of any crew. She is towed to Pearl Harbor.

Commander Ed Frank of the Naval Investigative Service is put in charge of the investigation. Frank is obsessed with the idea that there is a counterpart to the Bermuda Triangle at Latitude 30° N. in the Pacific. This is approximately where the

sub surfaced. Since the submarine is in first class working order, Frank convinces his superiors that he can prove his Pacific Bermuda Triangle theory by having the Candlefish retrace and follow in every detail her last voyage. The sole surviving member of the original crew, James Hardy, now an oceanographer, is contacted and persuaded to join the new crew. Through Hardy, we learn about the last voyage of the Candlefish and her original crew. The commanding officer, Billy G. Basquine, is not the Hollywood model of a submarine commander, as is Shannon in Return To Nowhere. He goes out of his way to make life miserable for Hardy because of a serious mistake Hardy made in clearing one of the torpedo tubes. Basquine plays on the emotions of his men skillfully, but, unlike Shannon, does not have a fatherly attitude towards them. To Basquine, the crew and the submarine merge together to become one single weapon of destruction. Despite Basquine's ability, the Candlefish does not have an enviable record for enemy tonnage sunk. This rankles Basquine, who is ambitious to make a good record for himself. There is a running battle with Japanese destroyers. After the submarine has been depth bombed repeatedly, Basquine tricks the Japanese into thinking that it has been sunk. Basquine sees this as an opportunity to increase dramatically his tonnage sunk record. He decides, contrary to orders and over the objections of his officers, to sail into Tokyo Bay and sink everything he can. On the way to Tokyo Bay, the Candlefish encounters strange forces and sinks.

As the Candlefish proceeds to recreate the last voyage of Basquine and crew, mysterious things happen. All contact is lost with its escort vessel. Japanese fighter planes of World War II vintage attack the submarine, machine gunning and killing the new commander, Louis Byrnes. All traces of him disappear. Frank takes over as commanding officer and soon begins to talk, act, and think like Billy Basquine. The rest of the crew also begin to act like their predecessors. The music coming in over the radio changes to what was popular in the

early 40's and is interrupted by the propaganda bulletins of Toyko Rose. All of the torpedoes, which had been carefully disarmed at Pearl Harbor, are found to be fully armed and battle ready. Hardy realizes that the old crew is taking over the submarine and that, if the voyage continues, Frank will sail into Toyko Bay and sink everything in sight.

Hardy finally convinces the Chief Petty Officer, Hopalong Cassidy, of what is happening. Cassidy had helped build the Candlefish early in World War II. He was a civilian navy yard worker and had never been to sea on a submarine before. Cassidy was recruited for this voyage because of his special knowledge of the Candlefish. Hardy and Cassidy decide to cripple the submarine so that the crew will abandon it. Cassidy cuts one of the oil lines, then watches in horror as the severed pieces reunite. Hardy deliberately damages one of the torpedoes; the battered torpedo head suddenly pops back into perfect condition by itself.

When the Candlefish enters the area of its former last dive, it is again caught in the vortex of powerful forces that hammer and twist its hull. Despite the contrary orders of Frank, Hardy and Cassidy convince the crew to abandon ship. Cassidy is the last man to leave. When he starts to ascend the conning tower, he is met by Hardy who looks as he did as a young officer in 1944. As the Candlefish plunges beneath the waters (for the last time, we hope), Hardy is welcomed back by his old comrades.

Adrift in the Pacific, the new crew do not know if they are still time captives in 1944 until they sight a Japanese freighter with the word DATSUN along her sides. The authors devote little attention to what happens to the crew after they are rescued except to state, almost as an afterthought, that twenty–one died within six months, thirteen underwent psychiatric care, and nine committed suicide. Perhaps to ease the reader's mind, the book ends with the statement that, after thirty–one days exploration at Latitude 30° N., a team of oceanographers was unable to find any evidence

of a Bermuda Triangle or the USS Candlefish.

■ Our comparison of the two novels convinces us that an ordinary reasonable person would find no similarity of expression and only a remote semblance of ideas. We reject appellant's argument that summary judgment is precluded because additional discovery would uncover evidence bearing on the question of substantial similarity and that the deposition of his expert witness created a triable issue of fact. It is difficult to understand how additional evidence, whatever it might be, could change the written words of the two novels. Nor can the testimony of an expert provide what is clearly lacking. Although we may not be qualified literary critics, we are fitted by training and experience to compare literary works and determine whether they evidence substantial similarity. We share Learned Hand's feeling that, in this type of case, expert evidence ought generally to be excluded. *Nichols v. Universal Pictures Corp.*, 45 F.2d at 123. The question of similarity of expression must start with a comparison of the two works. If, as here, it is clearly lacking, then summary judgment should be invoked.

■ Ordinarily, the question of jurisdiction would be the first order of business as to plaintiff's claims against defendants Neal R. Burger and George E. Simpson. In view of our affirmance of the trial court's summary judgment in favor of defendant Dell Publishing Co., however, we need not consider whether the trial judge was correct in dismissing the action as to Burger and Simpson for want of jurisdiction over the person. Our affirmance of the district court's conclusion as to substantial similarity necessarily means that there was no infringement by any of the defendants. In these circumstances, principles of collateral estoppel will bar plaintiff's claim against defendants Burger and Simpson, even if that claim is not adjudicated here. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322,

99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–330, 91 S.Ct. 1434, 1442–1443, 28 L.Ed.2d 788 (1971). Thus, the issue of personal jurisdiction over Burger and Simpson need not be considered. Because the defendants Burger and Simpson did not join in the motion for summary judgment, the trial court quite properly chose to address the jurisdictional issue, on which a decision would have been required had we not affirmed the summary judgment. Since we find it unnecessary to reach the jurisdictional issue, the district court's order of dismissal for lack of jurisdiction as to defendants Burger and Simpson will be vacated and the trial court will be directed to dismiss.

*The district court's judgment for defendant–appellee Dell Publishing Company because of lack of substantial similarity is affirmed.*

*As to defendants–appellees Neal R. Burger and George E. Simpson, the district court's judgment of dismissal for lack of jurisdiction is vacated and the case is remanded with directions to dismiss.*