TMTV, CORP., Plaintiff,

v.

MASS PRODUCTIONS, INC.,
et al., Defendants.

No. CIV.00–1338(RLA).

United States District Court,
D. Puerto Rico.

Nov. 24, 2004.

Roberto Sueiro–Del–Valle, Esq., San Juan, for Plaintiff/Petitioner.

Ileann M. Canellas–Correa, Esq., Laura Beléndez–Ferrero, Esq., Rafael Escalera–Rodríguez, Esq., Reichard & Escalera, San Juan, for Defendant/Respondent.

### ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

ACOSTA, District Judge.

The court has before it two motions for summary judgment filed by plaintiff herein which have been duly opposed. Discovery—including depositions and expert witness discovery—having concluded the matter is now ready for adjudication.

## I. BACKGROUND

This is a declaratory judgment action concerning authorship of a televised situation comedy ("sitcom") titled "20 Pisos de Historia", which aired weekly for over two years between 1997 and 1999. Plaintiff alleges work for hire authorship of the program and requests summary judgment be entered accordingly.

After having participated in "20 Pisos de Historia" for all of its duration, codefendant Emmanuel Logroño and various program actors moved to a different television channel and has, since March 2000 aired a sitcom titled "El Condominio". Also at issue in these proceedings via a second summary judgment motion is whether "El Condominio" is an unauthorized derivative work of "20 Pisos de Historia". If so, a subsequent determination regarding damages would be required.

We shall address these two matters separately for a better understanding. Initially we shall examine the evidence and the arguments presented regarding authorship of the sitcom "20 Pisos de Historia". Thereafter, we will determine whether the sitcom "El Condominio" is a derivative work based on "20 Pisos de Historia", and if so, whether it is an unauthorized derivative work.

## II. SUMMARY JUDGMENT

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660–61 (1st Cir.2000); *Barreto–Rivera v. Medina–Vargas*, 168 F.3d 42, 45 (1st Cir.1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. *De-Novellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir.1995).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir.2001); *Grant's Dairy v. Comm'r of Maine Dep't of Agric.*, 232 F.3d 8, 14 (1st Cir.2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". *Lopez–Carrasquillo v. Rubianes*, 230 F.3d 409, 412 (1st Cir.2000); *Maldonado–Denis v. Castillo–Rodríguez*, 23 F.3d 576, 581 (1st Cir.1994); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

## III. AUTHORSHIP OF 20 PISOS DE HISTORIA

### A. *Factual Background Regarding 20 Pisos de Historia*

TMTV Corp. ("TMTV") is a television producer which, as assignee of the rights underlying this action, claims ownership of a television sitcom program titled "20 Pisos de Historia". TMTV has validly entered into written agreements whereby it has been assigned by the appropriate predecessors in interest the full rights to bring this suit.

The aforementioned sitcom commenced airing as part of a two-hour long television program in 1997 titled "De Noche con Iris y Sunshine" which was originated and produced by plaintiff's predecessors in interest.

Codefendant Emmanuel "Sunshine" Logroño ("Logroño") was one of the two hosts of the aforementioned program. The other was a well-known dancer and actress named Iris Chacón ("Chacón").

The program originated when Antonio Mojena Zapico ("Mojena")—a well-known television and media producer, also owner and manager of TMTV as well as its predecessors in interest—proposed the idea for the "De Noche con Iris y Sunshine" show to Chacón and Logroño both of

which agreed to host the same and participate in various capacities.

Mojena agreed to pay Chacón and Logroño a fixed sum per program for their respective roles, plus a share of any advertising revenue in which either Chacón or Logroño participated directly, commonly referred to as integrations. No express or intended agreement or understanding was entered into with either Chacón or Logroño whereby Mojena agreed to share co-ownership of the program or any copyrights thereto. In effect, Logroño has admitted in his deposition that Mojena and his entities owned the program rights.

When planning the program, it was also agreed that it should contain a comedy section ("paso de comedia"). In order to discuss the nature of this comedy section, Mojena instructed that a brainstorming session be held to come up with ideas and alternatives. Logroño as well as various comedy, creative and script writing talent attended this initial session.

The purpose of the initial brainstorming meeting was to discuss several aspects of the two-hour long program which included the sitcom segment. General ideas about comedic situations were also mentioned.

It is undisputed that prior to the brainstorming meeting no pre-conceived comedy sitcom ideas were circulated. It is also clear from the record that when the meeting opened two of the comedy creatives, Messrs. Miguel Morales ("Morales") and Roberto Jiménez ("Jiménez"), suggested a sitcom segment dealing with a comedy of life in a condominium. The idea was first brought for discussion by them at this meeting and gained initial acceptance as a good possibility. Logroño then requested that Morales and Jiménez go ahead and write the original scripts for the initial sitcom programs. No scripts were written at the brainstorming meeting.

After leaving the meeting, Morales and Jiménez wrote the first three scripts (Morales wrote two and Jiménez one) of "20 Pisos de Historia" on their own, unsupervised as to time and place, with their own creative style of expression and wording and other script ingredients. Once finished, both Morales and Jiménez sent the scripts to Logroño, who with minor suggestions, proceeded to format the scripts in a special computer program which only he owned and which was used to generate the script lines in a format that was readily legible and used in the craft. When reformatting, Logroño inserted the names of Morales and Jiménez as the script authors.

A comparison of the original scripts as written by Morales and Jiménez and the reformatted computer scripts shows that except for an occasional word, phrase or minor change they are identical. Logroño asserts that because he did not agree with the original scripts as written by Morales and Jiménez he re-wrote the scripts before reformatting them in accordance with an outline or storyline which he allegedly provided to the scriptwriters at the original brainstorming meeting. However, the documentary evidence on record directly contradicts this assertion. The scripts written by Morales and Jiménez on their own and unsupervised, bear their own style of expression and are practically identical to the final reformatted scripts.

Both Morales and Jiménez were paid for their script-writing work by Mojena. Both Morales and Jiménez signed an agreement whereby they ratified a pre-existing agreement acknowledging that the aforementioned scripts were created as work for hire for plaintiff's predecessor in interest. This underlying work for hire premise and agreement was also confirmed by Morales and Jiménez in their depositions.

The three scripts written by Morales and Jiménez were used as the basis for the first three pilot programs of "20 Pisos de Historia". Subsequently, Logroño continued his participation in the program as a host, creative director, actor and scriptwriter.

Starting with the fourth program, Logroño commenced writing scripts for "20 Pisos de Historia" in addition to Morales and Jiménez. For this work Logroño did not receive, nor did he contemporaneously request additional remuneration. Rather, he continued receiving a fixed amount per program regardless of the degree of his participation.

Chacón's participation in the program ceased after some time. The program was then renamed "De Noche con Sunshine".

During the two-year period between November 1997—when the show started airing—and December 1999—when it ceased for the reasons further explained below— Mojena was its Executive Producer and paid for practically all expenses related thereto.

After approximately two years of airing the program which included the "20 Pisos de Historia" sitcom, Logroño, without prior approval from plaintiff or its predecessors in interest, moved with other program actors to a different television channel and has since produced and participated in another condominium-related sitcom entitled "El Condominio" without plaintiff's or Mojena's authority.

Plaintiff sued Logroño and Hilda Santini ("Santini") in their personal capacity as well as Mass Productions, Inc., a production company through which both Logroño and Santini have produced "El Condominio" commencing in March 2000 to the present.

Plaintiff seeks a declaratory judgment recognizing his authorship of "20 Pisos de Historia".

## B. *The Sitcom*

The sitcom "20 Pisos de Historia" takes place in a condominium lobby or reception area. Here the comings and goings of the condominium residents and visitors interact to produce comedic situations.

The lobby set contains a reception desk, various sitting and ornamental furniture, an elevator and varied decoration, all arranged in a particular layout, i.e., the sitting furniture center front, the reception desk center back, wall decoration center back, behind the reception desk, the elevator right back.

The characters include a security guard named Vázquez, a handyman or utility employee named Lolo, a condominium manager, an elderly woman named Soto, a younger woman named Laura, a young lad named Elpidio, among others. All these characters have particular character traits. Also, there are particular character interactions between these characters.

Similar to other well-known sitcoms such as "Friends", "Seinfeld", "Cheers", "I Love Lucy", and others, there is a basic distinguishing format to the program embellished by situation, character, character interaction, theme, mood, tempo, set layout and set decoration, costumes, lighting, camera angles, all of which produced a weekly sitcom named "20 Pisos de Historia". The combination of said myriad of factors distinguishes each sitcom from the other.

## C. *The Law of Ownership*

### 1. "20 Pisos de Historia" Eligible for Copyright Protection

We must begin by determining whether "20 Pisos de Historia" is a copyrightable work.

*Copyright...* protects the original expression of an author, whether that expression is found in books, computer programs, TV scripts, sound recordings, movies, paintings, photographs or any other conceivable medium from which that expression can be perceived.

Bruce P. Keller and Jeffrey P. Cunard, Copyright Law, A Practitioner's Guide, § 1:1.1 (P.L.I.2003).

Copyright protection extends only to original works of authorship that are fixed in any tangible medium of expression. Original in this context means only that the work originated with the author, as opposed to being copied from elsewhere, and that it shows some minimal creativity.

*Id.,* § 1:1.2 (citations and internal quotation marks omitted).

Copyright protection demands originality which calls for the author's independent and creative effort in his work.

Originality requires only that the author make the selection or arrangement independently (i.e., without copying that selection or arrangement from another work), and that it display some minimal level of creativity.

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 345, 358, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

▆ A work does not have to be novel to be copyrightable. As long as it contains original expression fixed in a tangible medium of expression such work merits copyright protection. Under the Copyright Act, as amended in 1976 ("Copyright Act" or "the Act"), "copyright protection subsists... in original works of authorship fixed in any tangible medium of expression... from which they can be perceived, reproduced, or otherwise communicated." 17 U.S.C. § 102.

▆ The originality requirement for copyright purposes has been held to mean that the work was not copied from previously existing works. Further, as long as the original elements of the work are not minimal the originality requirement is easily met. The originality requirement should not be confused with novelty, as is the requirement in patent law.

The originality requirement has been described by the Supreme Court as follows:

Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark no matter how crude, humble or obvious it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

*Feist,* 499 U.S. at 345, 111 S.Ct. 1282 (citations and internal quotation marks omitted).

▆ The purpose behind copyright protection of written or printed materials is to promote the creation of literary works which result in public benefit by allowing for the author's personal gain. *Id.* at 349–50.

Defendants' contention that other programs have used the condominium theme fails. No allegation has been made that "20 Pisos de Historia" was copied from any such program nor that there is any similarity of expression between "20 Pisos de Historia" and any other prior program.

Defendants further argue that the concept of life in a condominium is not subject to copyright protection. We agree that general concepts or ideas are not amenable to copyright protection. In other words, the ideas themselves may not be claimed as copyrighted rights. However, the statutory protection extends to the written or printed expressions of those ideas. 17 U.S.C. § 102(b).

> [N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work—termed "expression"—that display the stamp of the author's originality.

> [C]opyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original—for example... facts, or materials in the public domain—as long as such use does not unfairly appropriate the author's original contributions.

*Feist*, 499 U.S. at 350, 111 S.Ct. 1282 (citing *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547–48, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)); *Yankee Candle Co., Inc. v. Bridgewater Candle Co. LLC*, 259 F.3d 25, 33 (1st Cir. 2001) (ideas not copyrightable, only the original manner in which they are expressed); *Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir.1998) ("[a] major limitation on what is protectible under the copyright laws is capsulized in the notion that copyright protects the original expressions of ideas but not the ideas expressed.")

> Copyrightable subject matter extends only to the expression of ideas—words, pictures, and sounds—but not to the ideas themselves.

Bruce P. Keller, Jeffrey P. Cunard, Copyright Law, A Practitioner's Guide, § 1:1.2 (citation omitted).

In this vein, " 'the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization.' " *O'Neill v. Dell Publ'g Co., Inc.*, 630 F.2d 685, 687 (1st Cir.1980) (*citing Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2nd Cir.) *cert. den.*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)). "[P]rotectable expression includes the specific details of an author's rendering of ideas, or the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir.2002) (internal quotation marks and citation omitted). "The copyright owner's protectible property consists of the development, treatment and expression of such elements as theme, locale, settings, situations, ideas, bare basic plots and ordinary characters." *Gethers v. Blatty*, 283 F.Supp. 303, 305 (D.Cal.1968.)

Thus, regarding the threshold issue of copyrightability of "20 Pisos de Historia", we hold that it would be disingenuous to argue that the program, with all its thematic, plot, characters, character interacting, setting, decorative, costume, musical, pace, lighting, scenographic and other multiple expressive elements does not constitute an original work fixated in an audiovisual medium.[1]

Hence, defendants' general and conclusory allegations do not meet the necessary burden to impede a determination that "20 Pisos de Historia", with its myriad components, is not at least minimally original

---

1. Moreover, television pilot scripts and programs have been found to merit copyright protection. *See, i.e., Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir.1990); *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 25 F.Supp.2d 395, (S.D.N.Y.1998).

which is all that is required for copyright purposes.

■■■■ Literary works are fixed in a medium when they are for the first time transferred from ideas to fixed and written form containing an original expression of ideas and not the ideas themselves. 17 U.S.C. § 101. In effect, the author of a work for copyright purposes is the person who first translates an idea into a fixed, tangible expression entitled to copyright protection. *See Comty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) *See also,* 17 U.S.C. § 102. The fixation requirement is satisfied in audiovisual works if the live broadcast is simultaneously recorded in a fixed media, such as videotape. 17 U.S.C. § 101.

In this particular case fixation via the original scripts for the pilot programs and subsequent recording thereof is not at issue.

Based on the foregoing, we find that "20 Pisos de Historia" is a copyrightable and copyrighted work.[2]

### 2. Authorship of "20 Pisos de Historia"

#### (i) Logroño's Role

■■■■ As previously discussed, it is axiomatic that for copyright purposes the author of a work entitled to copyright protection is the person who first translates an idea into a fixed, tangible expression. The suggestion of any number of ideas and concepts does not suffice to turn the person or persons making those suggestions of ideas or concepts into authors for copyright purposes. Copyright is available only for the original expression of a work of authorship, not a mere idea. "To qualify as an author, one must supply more than mere direction or ideas." *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1071 (7th Cir.1994). "Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights." *Id.* at 1072.

> Childress was asked to write a play about "Moms" Mabley and did so. To facilitate her writing task, she accepted the assistance that Taylor provided, which consisted largely of furnishing the results of research concerning the life of "Moms" Mabley. As the actress expected to portray the leading role, Taylor also made some incidental suggestions, contributing ideas about the presentation of the play's subject and possibly some minor bits of expression. But there is no evidence that these aspects of Taylor's role ever evolved into more than the helpful advice that might come from the cast, the directors, or the producers of any play. A playwright does not so easily acquire a co-author.

*Childress v. Taylor,* 945 F.2d 500, 509 (2nd Cir.1991).

■■■■ It is undisputed that at the initial brainstorming session certain general ideas were discussed by those present and that the task of writing the initial scripts was assigned to two individual scriptwriters, i.e., Morales and Jiménez, who then proceeded to write them on their own.

---

**2.** In this particular case, copyrightability of the original scripts which form the basis of the derivative audiovisual work is presumed given the fact that the Copyright Office has registered—on plaintiff's name as work for hire—the original scripts prepared by Morales and Jiménez as well as the audiovisual programs resulting therefrom and defendants have failed to refute that presumption. *See Zyla v. Wadsworth,* 360 F.3d 243, 250 n. 5 (1st Cir.2004) (registration creates a rebuttable presumption of validity); *Lotus Dev. Corp. v. Borland Int'l, Inc.,* 49 F.3d 807, 813 (1st Cir.1995) (certificate constitutes *prima facie* evidence of copyrightability).

Further, it is uncontroverted that when the brainstorming session commenced, the idea of a sitcom in a condominium had not previously emerged. All parties agree that it was suggested for the first time by Jiménez during the brainstorming session and rapidly gained acceptance by the participants as a promising idea. Inasmuch as both Morales and Jiménez lived in condominiums the task of coming up with scripts naturally fell on them. This much is uncontested.[3]

Logroño has alleged in a conclusory and unsupported manner that he wrote an outline or storyline of the first scripts at the brainstorming session a fact which has not been accepted by either Morales or Jiménez. Logroño's assertion defies credulity and common sense. A court should not be obligated to accept what anybody else would strain to accept or what a jury would strain to accept. Accepting his version would mean that Logroño wrote not one, but three outlines or storylines for the three scripts at the brainstorming session.

Even if we accept Logroño's argument, a general outline would merely constitute ideas and it is a basic tenet of copyright law that only fixed and original expression of ideas are protected, not the ideas themselves.

There is no indication in the record that Logroño directed the writing of these original scripts. The most that could be said is that he may have brought up certain ideas at the brainstorming session, either verbally or in writing. Even if certain ideas were discussed at the brainstorming session as Logroño argues, there is no doubt that it was the two scriptwriters who wrote the initial scripts on their own, with their own style, wording, and expression.

In this case there is no need to enter into credibility issues, resolve conflicts in testimony or evaluate the weight of the evidence to resolve this matter. " 'Although we may not be qualified literary critics, we are fitted by training and experience to compare literary works and determine whether they evidence substantial similarity.' " *Segrets, Inc. v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 64 (1st Cir.2000) (citing *O'Neill v. Dell Publ'g Co.*, 630 F.2d at 687). *See also, Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 2 (1st Cir.1996) (court comparing designs to determine infringement).

As part of its motions for summary judgment plaintiff submitted deposition exhibits regarding the scripts for the first programs as prepared by Morales and Jiménez as well as audiovisual tapes of these three programs. Plaintiff also included Logroño's retyped versions of these three scripts. A cursory examination of the scripts as written by Morales and Jiménez when compared to the respective reformatted versions and the audiovisual tapes of said programs leads us to the inescapable conclusion that the changes are not significant. In other words, the scripts penned by Morales and Jiménez are basically identical to the final reformatted ones. Minor editorial revisions to those works do not constitute authorship. *Erickson,* and *Childress.* Therefore, Logroño's assertion that he rewrote the scripts penned by Morales and Jiménez before reformatting them is on its face baseless and contradicted by the documentary evidence.

In fact, Logroño himself acknowledged that the scripts were written by Morales and Jiménez when he himself credited them solely as authors of the scripts in the respective title pages.

---

**3.** *See* Logroño's deposition p. 81.

We find that Logroño has failed to adequately controvert the fact that these initial scripts were actually written after the introductory brainstorming session by the two scriptwriters on their own, without supervision. Further, the documentary evidence on the record shows that the scripts—as written by Morales and Jiménez—are virtually identical to the final reformatted product used for the broadcasted programs. Likewise, Logroño has failed to adequately refute the fact that Morales and Jiménez were the first persons who fixed in a tangible medium of expression the subject scripts.

As indicated by the Supreme Court in *Reid,* the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. Based on the foregoing we conclude that for present purposes Morales and Jiménez were the authors of the subject scripts.

It is also undisputed that the literary works or scripts which served as the basis for the original audiovisual dramatic work were fixed in writing according to the creative efforts of Morales and Jiménez. Logroño argues that he re-wrote the scripts written by Morales and Jiménez because he was purportedly dissatisfied with their scripts because allegedly they did not comport with Logroño's alleged brainstorming outlines or storylines. The fact that this may have been his practice at some later point in time does not controvert the fact that the first three scripts as originally penned by Morales and Jiménez were practically identical to the final reformatted scripts. The court can easily make this determination based on a simple comparison of the original and final scripts.

Thus, based on the documentary evidence in the record we can safely conclude that the three seminal scripts penned by Morales and Jiménez were the ones used as the basis for the pilot programs without being re-written by Logroño as he alleges.

## (ii) Work for Hire

A work for hire contract executed by an author can vest another with the authorship of the work for hire, provided, as in this case, that the work, i.e., original scripts, was commissioned for use in the production of an audiovisual work. The Copyright Act defines contractual work for hire as "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work for hire." 17 U.S.C. § 101. Pursuant to the Copyright Act the person for whom the work is prepared as a work for hire is deemed its author.

To this effect, in pertinent part 17 U.S.C. § 201 reads:

**(b) Works made for Hire.**—In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights comprised in the copyright.

■ Defendants argue that the after-the-fact contracts signed by Morales and Jiménez with Mojena reiterating their prior agreements constitute invalid means of establishing work for hire status for the subject scripts. We do not agree. A valid contract recognizing and reaffirming work for hire status may be signed after the work is produced. *Playboy Enter., Inc. v. Dumas,* 53 F.3d 549, 559 (2nd Cir.), *cert. den.* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995). In this particular case the written contracts merely ratify a clear and undisputed understanding be-

tween the parties. In their depositions both Morales and Jiménez readily concede that this was their understanding from the very beginning, prior to having written the scripts.

The three scripts penned by Morales and Jiménez served as the basis for the first three pilot programs of "20 Pisos de Historia". Based on their written agreement, plaintiff is the work for hire author and owner of these scripts. Therefore, plaintiff is the sole copyright owner of the pilot programs which served as the basis for the continuing series of "20 Pisos de Historia".

The court having determined that plaintiff is the work for hire author of the pilot programs of "20 Pisos de Historia" and that Logroño's ideas and minor revisions do not qualify him as author of these scripts under applicable copyright legal standards, we conclude that plaintiff is the sole author and owner of the original defining scripts used for the pilot "20 Pisos de Historia" sitcom.

### (iii) Co-authorship

■ In the case at hand there is no indication in the record that either plaintiff or its predecessors in interest contemplated sharing ownership or copyrights with Logroño or with anyone else at any time prior or subsequent to the production of the pilot programs of "20 Pisos de Historia". Co-authorship of a work may only occur if there was an intent by the original copyright holder to admit another party as co-author. *See, Fred Riley Home Bldg. Corp. v. Cosgrove*, 883 F.Supp. 1478, 1482 (D.Kan.1995) ("One may not become a co-author of a derivative work by default without the knowledge, consent and agreement of the other alleged co-author. There is no evidence of such intent or agreement [in this case].") The subsequent scripts written after the pilot "20 Pisos de Historia" aired and which were

based on said pilot copyrighted program were not prepared with plaintiff's intention of granting co-authorship rights to Logroño. Such intent is a necessary pre-requisite for co-authorship rights to exist. *See, i.e., Childress*, 945 F.2d at 508 ("[A] useful test will be whether, in the absence of contractual agreements concerning listed authorship, each participant intended that all would be identified as co-authors.") In effect, codefendant Logroño unequivocally admitted in his deposition that ownership of the program belonged to plaintiff's predecessors in interest.

Based on the foregoing, we conclude that plaintiff owns the copyrights of the entire two year series of "20 Pisos de Historia" with the concomitant right to claim infringement if a substantially similar program were to be aired copying therefrom.

### 3. Subsequent Programs as Derivative Works Owned by Plaintiff

■ The Copyright Act establishes the exclusive rights enjoyed by the copyright holder which include: reproduction of the copyrighted work, preparation of derivative works, distribution of copies, performance, and public display. Thus, the Copyright Act protects a copyright owner's exclusive right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). Only the copyright holder is allowed to produce derivative works and the Copyright Act specifically bestows this right exclusively upon the copyright holder. 17 U.S.C. § 106(2). *See, i.e., Zyla v. Wadsworth*, 360 F.3d at 250 ("Only Thomson, which is the sole owner of the third edition, may claim a copyright interest in such derivative works.")

A "derivative work" is defined as "a work based upon one or more preexisting works, such as a translation, musical ar-

rangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

The Copyright Act defines derivative works as those "based upon" the copyrighted work. Courts interpret the Act to mandate that derivative work that is "substantially similar" to the original work upon which it is based is an infringement... When determining similarity, courts are to look at the "total concept and feel" of the designs. When comparing the designs, it is not sufficient to dissect separate components and dissimilarities. The original way that the author "selected, coordinated, and arranged the elements" of her work is the focus of the court. Although all derivative works have differences from the original, it is the similarities, rather than the differences, that inform whether the "total concept and feel" of the works and their "aesthetic appeal" is the same.

*Atkins v. Fischer*, 331 F.3d 988, 993–94 (D.C.Cir.2003) (citations omitted).

There is no doubt in the case at bar that the "20 Pisos de Historia" programs broadcasted after the initial pilot programs are substantially similar derivative works based on the copyrighted "20 Pisos de Historia" authorized by and belonging to plaintiff's predecessors in interest.

Thus, absent plaintiff's authorization as copyright holder of "20 Pisos de Historia" defendants' production of a derivative work—other than under a permission without transfer or granting of copyright—would constitute an infringement by defendants in any claim that exceeds the permission granted.

The Copyright Act grants the owner of the copyright the *exclusive right* to pre-

pare derivative works based upon the copyright work. So [plaintiff] could not make a derivative work based on the [defendant's] symbol without [defendant's] authorization even if [plaintiff's] guitar had a smidgeon of originality. This is a sensible result. A derivative work is, by definition, bound to be very similar to the original. Concentrating the right to make derivative works in the owner of the original work prevents what might otherwise be an endless series of infringement suits posing insoluble difficulties of proof... It is very difficult to see how a derivative work not made by the owner of the original work could fail to infringe it, given the definition of derivative work.

*Pickett v. Prince*, 207 F.3d 402, 405–06 (7th Cir.2000) (citations omitted).

As previously discussed there was never an intent to establish co-authorship with Logroño. Further, there is no evidence that plaintiff's predecessors agreed to transfer or otherwise grant to Logroño their exclusive rights to produce derivative works based on the copyrighted pilot programs of "20 Pisos de Historia". In effect, pursuant to 17 U.S.C. § 204(a) such transfer or grant would require a written agreement not present in this case.

Accordingly, we find that TMTV is the sole author and copyright holder of all subsequent and derivative "20 Pisos de Historia" programs aired subsequent to the initial pilot programs.

## IV. "EL CONDOMINIO'S" STATUS AS A DERIVATIVE WORK

### A. *Factual Background Regarding "El Condominio"*

Codefendant Logroño with other program participants left "20 Pisos de Historia" in December 1999, and, in March 2000 without obtaining Mojena's authorization,

commenced airing "El Condominio" sitcom at a different television station, Channel 4.

Prior to airing the new program those responsible for "El Condominio" launched an advertising campaign informing the general public that the condominium sitcom had moved to a different channel. The message conveyed to the television audience was essentially that they would merely have to tune to another television station to continue watching the same sitcom. Specifically, part of the promotion consisted of a photograph of codefendant Logroño and other "20 Pisos de Historia" participants [a total of six] in the same costumes previously used in the "20 Pisos de Historia" inviting the public to tune in to another television station.

Thus, except for the change in name no attempt was made by defendants to differentiate between the new and the old programs. The idea conveyed to the audience was merely a new location for the sitcom previously known as "20 Pisos de Historia".

As can be readily observed from the audiovisual evidence submitted, when the new show started airing in March, 2000, the same characters, with the same names and costumes were used as those previously appearing in "20 Pisos de Historia". Further, "El Condominio" sitcom also takes place primarily in a condominium's lobby. The set layout is also similar to that of "20 Pisos de Historia", as is the character interaction. In sum, generally there is great similarity between the two programs.

The first episode of "El Condominio" even makes reference to the program's "relocation" which evinces a clear indica-

tion of the continuity from the previous "20 Pisos de Historia". Otherwise, it would not be logical to speak of a change of venue.

### B. *Infringement*

■ In order to establish copyright infringement "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361, 111 S.Ct. 1282. That is, plaintiff must present evidence of "both ownership of a valid copyright and illicit copying." *Yankee Candle Co.*, 259 F.3d at 33. *See also, Segrets*, 207 F.3d at 60; *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d at 813; *Matthews v. Freedman*, 157 F.3d at 26–27; *Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 605 (1st Cir.1988).[4]

■ Once ownership has been established, "[t]he first step requires a plaintiff to prove that the defendant copied the plaintiff's copyrighted work as a factual matter (either directly or through indirect evidence). In the second step, the plaintiff must prove that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" *Segrets*, 207 F.3d at 60. In order to ascertain whether illicit copying has occurred the court must initially determine that the defendant copied the protected work and if so, that both the original and copied works are "substantially similar". *Yankee Candle Co.*, 259 F.3d at 33.

■ Ordinarily direct evidence of copying is not available. Thus, copying is usually established by proving that the defen-

---

4. The test expounded by *Feist* is applicable to all infringement claims be it based on unauthorized reproduction under § 106(1) or unauthorized production of a derivative work under § 106(2). *See, Madrid v. Chronicle*

*Books,* 209 F.Supp.2d 1227, 1237 n. 5 (D.Wyo.2002) (copying used "as a shorthand reference to any infringement of the copyright holder's exclusive rights that are set forth at 17 U.S.C. § 106.")

dant had access to the original work and that both articles are "substantially similar". *Concrete*, 843 F.2d at 606. *See, Yankee Candle Co.*, 259 F.3d at 33 n. 4 (in situations where direct evidence of copying is lacking plaintiff may create an inference of copying by proving that the defendant had access to the original work and that both works are "substantially similar".)

Hence, the "substantially similar" standard has two different applications in cases involving copyright infringement. Its use is triggered initially when there is a need to establish that copying occurred by circumstantial evidence. Once copying has been established, both works must be compared to determine whether the purportedly infringing work is substantially similar to the protected expression. *Yankee Candle Co.*, 259 F.3d at 33 n. 4. *See also, Matthews*, 157 F.3d at 27 n. 1 (substantial similarity rubric used to define both infringement as well as an evidentiary inference of copying.)

■ Once unauthorized copying has been established whether or not improper appropriation has occurred will depend on "[w]hether there is substantial similarity between copyrightable expressions [as] determined by the 'ordinary observer' test. The test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protected expression by taking material of substance and value." *Yankee Candle Co.*, 259 F.3d at 33. (citations and internal quotation marks omitted); *Segrets*, 207 F.3d at 62. *See also, Matthews*, 157 F.3d at 28 ("[c]ase law supports the 'ordinary observer' test"); *Concrete*, 843 F.2d at 607 ("[u]nder traditional analysis, whether there is substantial similarity between copyrightable expressions is determined by the 'ordinary observer' test.")

The "ordinary observer" is an elusive concept and the courts have attempted to define it in various ways. *See, i.e., O'Neill*, 630 F.2d at 687 (whether an "ordinary reasonable person would not find any substantial similarity between the two works"); *Ideal Toy Corp. v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2nd Cir.1966) ("whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work"); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2nd Cir.1960) (substantial similarity determined if "unless [ordinary observer] set out to detect the disparities, would be disposed to overlook them and regard their aesthetic appeal as the same.")

■ It is beyond cavil that copyright law does not protect ideas but only the original style in which an author expresses those particular ideas. "A major limitation on what is protectible under the copyright laws is capsulized in the notion that copyright protects the original expressions of ideas but not the ideas expressed." *Matthews*, 157 F.3d at 27. *See also, Concrete*, 843 F.2d at 606 (author's rights limited to "original manner of expressing ideas, not the ideas themselves.") (citations and internal quotation marks omitted).

In the case of literary works, the analysis will focus on the expression of the traditional elements used in that genre.

In comparing two literary works to determine if there is substantial similarity, it must be borne in mind that "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization.".

*O'Neill*, 630 F.2d at 687 (*citing Reyher v. Children's Television Workshop*, 533 F.2d. at 91).

■ The decision of what constitutes "protected expression" must be made by the court as a legal matter. Once this determination is made, the question of whether two works are substantially similar (and corresponding application of the ordinary observer test) is a matter for the trier of fact unless summary judgment is proper." *Yankee Candle Co.*, 259 F.3d at 34 n. 5. In this Circuit substantial similarity has been treated as a " 'mixed question of fact and law.' " *Segrets*, 207 F.3d at 64 (*citing O'Neill v. Dell Publ'g Co.*, 630 F.2d at 687).

In particular situations the court has been found qualified to make the determination that infringing substantial similarity is present. " 'Although we may not be qualified literary critics, we are fitted by training and experience to compare literary works and determine whether they evidence substantial similarity.' " *Id.*, (*citing O'Neill v. Dell Publ'g Co.*, 630 F.2d at 687). *See also, Grubb v. KMS Patriots, L.P.*, 88 F.3d at 2. In *Matthews*, 157 F.3d at 28 substantial similarity was determined by the court "based solely on a visual comparison of two items easily available to the reviewing court."

■ Minor differences will not preclude infringement. "Slight or trivial variations between works will not preclude a finding of infringement under the ordinary observer test." *Segrets*, 207 F.3d at 65; *Concrete*, 843 F.2d at 608. "Case law supports... the disregard of minor differences in favor of major similarity." *Matthews*, 157 F.3d at 28. "[L]imited changes do not overcome the conclusion of overall similarity the ordinary observer 'inevitably' has on viewing [both designs] side-by-side." *Segrets*, 207 F.3d at 65.

As previously noted, once copying has been established the next step is to ascertain whether the allegedly infringing derivative work is "substantially similar" to the protected material. "Courts interpret the Act to mandate that derivative work that is 'substantially similar' to the original work upon which it is based is an infringement." *Atkins v. Fischer*, 331 F.3d at 993; *See, Madrid v. Chronicle Books*, 209 F.Supp.2d at 1239 (assuming copying "this case turns on whether there is a substantial similarity between the protectable aspects of Plaintiff's poem and Defendants' [derivative] works."); *Bar–Meir v. North Am. Die Cast Ass'n*, 176 F.Supp.2d 944, 949 (D.Minn.2002) (citations and internal quotation marks omitted) ("infringing [derivative] work must be substantially similar to the copyrighted work."); *Eiben v. A. Epstein & Sons Int'l, Inc.*, 57 F.Supp.2d 607, 611 n. 5 (N.D.Ill.1999) ("Copying from a copyrighted item constitutes infringement if the derivative work is 'substantially similar' to the underlying work."). *See also, Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 117 (2nd Cir. 2003) (citation and internal quotation marks omitted) ("Because the allegedly derivative work... sufficiently transformed the expression of the original work... such that the two works ceased to be substantially similar, the secondary work is not a derivative work and, for that matter, does not infringe the copyright of the original work.")

In other words, "[a] derivative work must be substantially different than the original work. The differences must be more than trivial and may not include actual or mechanical copying." *Fred Riley Home Building Corp.*, 883 F.Supp. at 1483.

The comparison between the works to allegedly derivative work and the copyrighted material will be carried out from the standpoint of an ordinary observer. "The question is whether an average lay observer would recognize the alleged [derivative] copy as having been appropriated

from the copyrighted work." *Atkins v. Fischer*, 331 F.3d at 993 (citation and internal quotation marks omitted).

 The pertinent legal criteria for identifying a derivative work has already been discussed. Briefly stated, a "derivative work" is defined as "a work based upon" a copyrighted work. 17 U.S.C. § 101 The Act grants the copyright holder the exclusive right to prepare derivative works based on its copyrighted works. 17 U.S.C. § 106(2). Implicit in this right is the prerogative to authorize others to prepare derivative works. "Creation of a derivative work requires consent by the owner of the original copyright to the creation of a derivative copyrightable work." *Fred Riley Home Bldg. Corp.*, 883 F.Supp. at 1482. Hence the lack of authorization by the copyright holder to produce a derivative work constitutes an infringement.[5]

To this end, we must initially determine whether plaintiff can claim copyright and secondly, whether there has been copying as a matter of fact to such an extent that it rendered the infringing and copyrighted works "substantially similar." *Segrets*, 207 F.3d at 60.

We have already held that plaintiff holds a valid copyright to both the seminal scripts and three original pilot programs. Hence, any sitcoms based upon that copyrighted material will violate § 106 if found to be substantially similar.

Following *Feist*, we then proceed to address the next factor, i.e., copying. Ordinarily no objective evidence of the process by which the challenged material was developed is available to the courts for which reason they normally rely on the inferences which may be drawn from two basic factors: access and similarity. *Murray*

*Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (6th Cir.2004).

 In this particular case access cannot be denied. It is undisputed that Logroño participated in the "20 Pisos de Historia" sitcom since its origin. In effect, Logroño himself was involved in the production of and even wrote subsequent scripts used for "20 Pisos de Historia." As to similarity, it is important to note that defendants, through the advertising campaign for the "El Condominio" sitcom practically conceded that the programs were essentially the same.

Defendants' advertising campaign announcing a mere channel move constitutes a clear admission that in the minds of defendant Logroño and others, "El Condominio" was to be based on the prior "20 Pisos de Historia" program. Otherwise, they would have had to explain details about the new program which was not done. Instead, Logroño and the other actors merely appeared in a photograph and indicated that they had moved to a new location. Obviously, Logroño was publicly conveying his intention that the public clearly perceive that the new program was to be based on the prior "20 Pisos de Historia" sitcom in which he, along with the other participants/actors had appeared on a weekly basis for over two years. The advertising of "El Condominio" presupposed that the ordinary observer was familiar with "20 Pisos de Historia".

By repeatedly appearing in the advertisement codefendant Logroño has, in conjunction with other participants, openly and publicly recognized the similarity between both programs and has tried to capitalize on said similarity.

---

**5.** There is no indication in the record that either plaintiff or its predecessors in interest authorized the production of the aforementioned derivative work. To the contrary, the record shows opposition to this production culminating in the filing of this suit.

This may also explain the striking similarity between "20 Pisos de Historia" and "El Condominio" in a myriad aspects. Even a quick perusal will show that but for a few minor details both programs are nearly identical. It was evident that the idea was to capitalize on the accumulated goodwill of the prior program so that the transition to the new channel was seamless.

As previously discussed, striking similarity precludes the possibility of independent creation, more so as in this particular case where access to the prior work is indisputable. Moreover, the striking similarity of many of the elements of the program precludes the possibility of independent creation regardless of access. In this case "the [s]imilarit[ies] ... between the copy and the original [are] so striking that there is no possibility of independent creation. Therefore, copying can be inferred regardless of proof of access." *Wilcom Pty. Ltd. v. Endless Visions,* 128 F.Supp.2d 1027, 1031–32 (E.D.Mich.1998).

Here the similarities are so numerous that they far outweigh dissimilarities. The characters carry over from one program to the other, their names are identical in both programs, the character interaction is almost identical, their costumes are the same, and there is very similar comedic expression in said interaction. Further, the setting and camera angles are almost identical and the action in both programs mostly takes place in a condominium lobby which in turn, is set up almost the same.

The court must then proceed to determine whether an ordinary observer would consider that both works are so similar that an ordinary reasonable person would inevitably conclude that one appropriated from the other. "[T]he ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.

That is enough; and indeed, it is all that can be said, unless protection against infringement is to be denied because of variants irrelevant to the purpose for which the design is intended." *Peter Pan Fabrics,* 274 F.2d at 489.

Although all derivative works have differences from the original, it is the similarities, rather than the differences, that inform whether infringement has occurred. A copier cannot avoid responsibility by emphasizing dissimilarities in an attempt to obscure the substantial similarities between the two works. "[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2nd Cir.) *cert. den.,* 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936).

In this court's opinion, the similarities between the two programs are so striking that there is no doubt that "El Condominio" is a derivative work of "20 Pisos de Historia" and for that matter an unauthorized derivative work. In effect, it can be gainsaid that both programs are the same with only a difference in name and transmitted via a different channel. Specifically, the setting, character names, costumes, character interaction, comedy line, mood, camera angles are almost identical in both sitcoms.

Based on the foregoing, we find that in this case an ordinary observer would "inevitably" conclude that "El Condominio" is basically the same program as "20 Pisos de Historia". Once again, this should not be surprising since "El Condominio" was advertised as such. Further, this conclusion is bolstered by the great similarity of the overwhelming majority of expressive components of both programs.

Given the undisputed facts in this case, summary judgment for plaintiff is proper

and there is no need to bring the infringement aspect of this case before a jury. "[T]he court does not need circumstantial evidence to compare two works which are plainly expressed... Either similarities exist, or they do not." *Madrid v. Chronicle Books*, 209 F.Supp.2d at 1235.

Summary judgment is proper in favor of the plaintiff in a copyright infringement case where the similarity between the copy and the original is so similar that reasonable minds could not differ... The possibility of independent creation is virtually impossible. Therefore, plaintiffs are entitled to judgment as a matter of law on the copyright infringement claim.

*Wilcom*, 128 F.Supp.2d at 1032 (citations omitted).

Therefore, this court holds that "El Condominio" is an unauthorized derivative work of "20 Pisos de Historia" which copyright belongs to plaintiff.[6]

## V. CONCLUSION

Based on the foregoing, plaintiff's Motions for Summary Judgment (dockets No. 71 and 72)are **GRANTED**.[7]

Accordingly, the court finds as follows:

1. Plaintiff is the sole owner and work for hire author of the "20 Pisos de Historia" series;[8] and

**6.** The fact that some characters which appeared in "20 Pisos de Historia" may have pre-existed in some degree of definition to the sitcom does not allow said characters, absent an agreement and authorization to such effect—not present in this case—to produce an unauthorized derivative work substantially similar to the copyrighted work of "20 Pisos de Historia". Only the copyright holder has such exclusive right. Defendant Logroño conceded in his deposition that the program belonged to plaintiff's predecessors in interest.

2. "El Condominio" is an unauthorized derivative work of "20 Pisos de Historia".

The only issue remaining in this action is a determination of the appropriate damages which will be scheduled for trial.

IT IS SO ORDERED.

**7.** *See also*, Opposition (docket No. **73**); Reply (dockets No. **74**, **75** and **77**); Sur–Reply (docket No. **76**); and Supplemental Memorandum (docket No. **94**). Plaintiff's Motion to Strike (docket No. **95**) is DENIED. *See*, Response to Motion to Strike (docket No. **96**) and Motion in Relation to Striking of Supplemental Memorandum (docket NO. **97**).

**8.** Given our findings it is unnecessary to discuss the other employer-employee work for hire summary judgment prong presented by plaintiff.